Argued June 3, reversed July 24, 1968, petition for writ of
certiorari denied by United States Supreme Court
January 13, 1969

IVANCIE, *Respondent, v.* THORNTON ET AL,
*Appellants.*

443 P. 2d 612

*Malcolm J. Montague* and *Oliver I. Norville,* Portland, argued the cause for appellants. With them on the brief were Williams, Montague, Stark & Thorpe, and Alexander G. Brown, City Attorney, Portland.

*Nathan Heath,* Portland, argued the cause for respondent. With him on the brief were Gray, Fredrickson & Heath, Portland.

Before Perry, Chief Justice, and McAllister, Sloan, O'Connell, Goodwin, Denecke and Holman, Justices.

GOODWIN, J.

Plaintiff, an elected city commissioner holding office in Portland, brought declaratory proceedings to have Section 2-206(a) of the Portland city charter declared unconstitutional. The trial court held the section unconstitutional on the ground that it could not be distinguished from a statute held unconstitu-

tional in *Minielly v. State,* 242 Or 490, 411 P2d 69 (1966). The city appeals.

The charter provision, adopted by the voters of Portland in an election on May 18, 1934, as a part of the home-rule power reserved to cities by Oregon Constitution, Art XI, § 2, and Art IV, § 1a, reads as follows:

"* * * A vacancy in office shall occur whenever the mayor, a commissioner or the auditor shall, during his term of office, become a candidate for any lucrative district, county, state or national office elective by the people, or whenever the city attorney or any of his deputies, a municipal judge, the city engineer, the city treasurer, a deputy city treasurer, the purchasing agent, or a member of any city board, or commission who has been appointed by the mayor or the council, becomes a candidate for any lucrative district, city, county, state or national office elective by the people. All such vacancies resulting from candidacies shall commence when such person shall file his declaration or acceptance of candidacy with the officer authorized to receive and file the same." Section 2-206(a), Charter of the City of Portland (1967).

The *Minielly* decision struck down ORS 241.520 and 241.990(3), which denied to all civil-service employees and to all persons on the civil-service eligiblity lists in certain counties the right to "be a candidate for popular election to any public office * * *." ORS 241.520. The plaintiff was a deputy sheriff who desired to file for the office of sheriff. We held the statute defective for overbreadth in restricting First Amendment rights.

Reviewing a similar statute in a case which involved a nurse in a public hospital who was discharged for carrying recall petitions contrary to a local ordinance, the California Supreme Court said: "The over-

breadth of the statute lies in the wide swath of its prohibition of employee participation in a number and variety of elections * * *." *Bagley v. Washington Township Hospital Dist.,* 65 Cal 2d 499, 509, 421 P2d 409, 416, 55 Cal Rptr 401, 408 (1966).

Any forced surrender of First Amendment rights is closely scrutinized for unconstitutionality. *Minielly v. State,* supra. And see Note, 61 Harv L Rev 1208 (1948). Political activity is a First Amendment right. *N. A. A. C. P. v. Button,* 371 US 415, 83 S Ct 328, 9 L Ed 2d 405 (1963). Termination of employment is an effective deterrent to political activity. *Minielly v. State,* supra.

The *Minielly* case dealt with a statute that was conspicuously broad. It purported to bar all government employees from all avenues to elective office. The breadth of the statute in the *Minielly* case could not be justified by any legitimate governmental purpose. We said there that if the intent of the statute had been merely to preserve harmony in certain governmental departments by requiring specified employees to resign if they wanted to run against an employer, the statute should have said so. See *Fort v. Civil Service Commission,* 61 Cal 2d 331, 392 P2d 385, 38 Cal Rptr 625 (1964). The statute struck down in *Minielly* barred too many persons from too many constitutionally protected activities without the showing of a compensating governmental purpose to be served. We observed in *Minielly,* however, that circumstances could justify a limitation upon the political activity of certain types of officers and employees if the limitation were narrowly drawn and if it were imposed solely to accomplish a justifiable governmental purpose.

In this case, it is argued that the two operative classifications of Section 2-206(a) cannot be severed,

and that the clause purporting to eliminate a class of appointive officers from political life, in or out of city government, is unconstitutional for overbreadth, pulling the whole section down with it even if the remainder of the section is constitutional. We need not decide the validity of the clause relating to subordinates. At common law, legislation must be treated as severable whenever possible, so that the constitutional portions can be sustained.[1] See *Dilger v. School District 24CJ*, 222 Or 108, 119, 352 P2d 564 (1960). The charter provision relating to subordinates is clearly severable from the one relating to elective officials.[2]

■ When the clause relating to the appointive subordinates is severed, the charter limitation is narrowly focused upon the incumbent holders of three named offices. The provision can withstand constitutional challenge, however, only if its effect upon freedom of expression goes no further than necessary to accomplish a reasonable governmental purpose. To justify any restrictions upon political freedom, the purpose

---

[1] For acts of the Legislative Assembly, this rule has been codified as follows:

ORS 174.040. "It shall be considered that it is the legislative intent, in the enactment of any statute, that if any part of the statute is held unconstitutional, the remaining parts shall remain in force unless:

"(1) The statute provides otherwise;

"(2) The remaining parts are so essentially and inseparably connected with and dependent upon the unconstitutional part that it is apparent that the remaining parts would not have been enacted without the unconstitutional part; or

"(3) The remaining parts, standing alone, are incomplete and incapable of being executed in accordance with the legislative intent."

[2] A rule against severability said to apply to First Amendment cases because of the evil of prior restraint in censorship has no application in a case of this kind where censorship in general is not a threat. Those affected by the ordinance are specifically designated. Cf., Thornhill v. Alabama, 310 US 88, 60 S Ct 736, 84 L Ed 1093 (1940).

of the law must be to protect a substantial governmental interest. Thus, if the purpose of the law is to remedy some substantive evil, the city must show what the evil is and how the restriction can reasonably be expected to remedy it. In defense of its charter provision, the city has relied upon a number of factors, including its scheme of government and the historical background of the questioned amendment.

The people of Portland, by home-rule charter amendments in 1913, reaffirmed an earlier charter which had created a form of city government in which commissioners would exercise both legislative and executive powers. Thus, today, while sitting with the mayor in the legislative deliberations of the city council, the commissioners enact ordinances; at the same time, in their administrative capacity, the individual commissioners make executive decisions and respectively manage the specific areas of city activity assigned to their executive jurisdiction. All city commissioners, the mayor, and the auditor, designated in the charter provision under examination, are required by Section 3-105 of the Charter of the City of Portland to be elected by the voters of the city on a nonpartisan ballot. They must execute an oath to the effect that they are not supported by any political party.

Newspaper editorials offered as exhibits in this case suggest that the voters of the city of Portland in 1934 wanted their city officials to use their nonpartisan positions of legislative and administrative power exclusively to serve the city. The exhibits suggest also that the voters may have deemed it undesirable for their city officers, while on the job, to seek partisan political influence or to collect political campaign funds with which to launch careers in state and national politics. Indeed, from the use of the word "lucrative,"

the voters apparently deemed it advisable for their city officials to resign before seeking any other salaried office, including the nonpartisan statewide offices of judge or superintendent of public instruction. While such a provision is broad in its effect, it is not necessarily overbroad in terms of its purpose.

The city argues that potential conflicts of interest could confront a city commissioner in passing upon licenses, zoning matters, and contracts in his capacity as a commissioner at the same time he was soliciting campaign funds in order to run for an elective state office. While similar arguments can be advanced for restricting all political activity by officeholders, and thus can be reduced to an attack on democratic government in general, we cannot say that the voters of the city had no right to consider conflicts-of-interest problems as suggested by the newspaper editorials favoring the measure.

The issue before the voters was widely debated. The Portland City Club, for example, in a well-reasoned report, opposed the measure as unwise, unnecessary, and unworthy of a democratic society.

Separation of city government from state and national party politics is not a new concept. Such separation was widely advocated by political scientists in the years between 1893 and 1950. See Frank Mann Stewart, *A Half Century of Municipal Reform, A History of the National Municipal League* (Univ of Calif Press 1950). Fashions in political science may be trending the other way today, but the choice is one for voters to make.

■ We conclude that the wisdom of the charter provision is a political question. The only judicial question is whether the political restrictions are so incon-

sistent with the First Amendment as to be beyond the power of the voters to enact.

■■ In the cases striking down statutes for infringing upon First Amendment rights, it is now settled that government may not, by taxes, licenses, punishment, or withholding of benefits, attempt to regulate speech, assembly, and political activity, except within extremely narrow limits. See *Smith v. California,* 361 US 147, 154, 80 S Ct 215, 4 L Ed 2d 205 (1959) ; *Speiser v. Randall,* 357 US 513, 526, 78 S Ct 1332, 2 L Ed 2d 1460 (1958) ; *Vogel v. County of Los Angeles,* 68 Cal 2d 18, 434 P2d 961, 64 Cal Rptr 409 (1967). If a challenged statute is so broad, or so vague, that it creates a danger that it will impede the legitimate exercise of protected rights beyond the reasonable needs of the governmental interest sought to be protected, the statute is unconstitutional. *Thornhill v. Alabama,* 310 US 88, 60 S Ct 736, 84 L Ed 1093 (1940).

One indicator of defective vagueness is power granted to an executive officer selectively to enforce the law or stay enforcement more or less at his discretion. See Note, *The Void-for-Vagueness Doctrine in the Supreme Court,* 109 U Pa L Rev 67, 88 (1960). There is, of course, no such problem in the provision under scrutiny.

Another indicator of repugnancy, when a statute is tested against the First Amendment, is the tendency of the threat of enforcement of the statute to inhibit the free exercise of protected rights on the part of persons who, although not directly affected, might deem themselves to be threatened by the statute. See, e.g., *N. A. A. C. P. v. Button,* supra; *Thornhill v. Alabama,* supra. And see Note, 61 Harv L Rev, supra at 1208. There is in the case at bar no such problem as far as the mayor, auditor, and commissioners are con-

cerned. The requirements of the statute are definite and certain; the persons and offices regulated are narrowly defined.

Another common vice of statutes that impinge upon free expression, failure to give adequate warning, is obviously absent in the case at bar. See *Lanzetta v. New Jersey,* 306 US 451, 59 S Ct 618, 83 L Ed 888 (1939).

The only colorable ground for attack upon the challenged charter provision is that the city seeks to exact an onerous condition upon the exercise of a First Amendment right: the mayor, the commissioner, or the auditor must remove himself from the city payroll when he becomes a candidate for partisan or other office outside the system of city government. This condition, which a candidate voluntarily accepts when seeking city office, must be weighed against the reasonableness of the desire of the local voters to keep certain of their cityhall officials out of state and national politics while they are drawing a city salary.

In the original Oregon Constitution, judges of the supreme court and circuit court were required to forswear political ambition outside the judiciary. See Oregon Constitution, Art VII (Orig), §§ 10 and 21. The constitutional oath was retained by amendments in 1910, but was limited to judges of the supreme court. A statutory oath applies to circuit judges. See *Ekwall v. Stadelman,* 146 Or 439, 30 P2d 1037 (1934). We believe the situation of the mayor, auditor, and commissioners under the Portland charter is more nearly analogous to the undertaking of a judge to remain aloof from nonjudicial politics than to the situation contemplated in the statute which was stricken in the *Minielly* case.

The Portland charter provision, while perhaps not

a common one, is not unique. In Philadelphia, a much more restrictive provision has been twice before the Pennsylvania courts, apparently without the question of unconstitutionality being suggested. There no officer or employee of the city can run for any office, including city office, except for his own re-election, without resigning. See *Mayer v. Hemphill,* 411 Pa 1, 190 A2d 444 (1963), and related cases discussed therein.

■■ Whether or not as a matter of political theory or preference we might agree with the voters of the city of Portland, we do not believe that their charter amendment calls for judicial intervention. Unconstitutionality is not to be presumed nor lightly to be declared. Standing alone, the provision relating to the mayor, auditor, and commissioners is constitutional.

Reversed.