Daniel ACEVEDO, Melissa Bidwell, Gene Cessna, Appellants, Cross-Appellees,

v.

CITY OF NORTH POLE, Appellee, Cross-Appellant.

Nos. 7120, 7251.

Supreme Court of Alaska.

Oct. 28, 1983.

Law Officer Richard D. Savell, Fairbanks, for appellant/cross-appellee, Acevedo.

Joseph W. Sheehan, Fairbanks, for appellee/cross-appellant.

Before BURKE, C.J., RABINOWITZ, MATTHEWS and COMPTON, JJ., and BUCKALEW, Superior Court Judge.*

OPINION

MATTHEWS, Justice.

Daniel Acevedo was a permanent employee of the City of North Pole working as a police officer. While he was so employed,

---

* Buckalew, Superior Court Judge, sitting by assignment made pursuant to Article IV, Section 16, of the Constitution of Alaska.

Acevedo had his name placed on the November 3, 1981 ballot as a candidate for a three-year term on the North Pole City Council. Acevedo was elected to that position, receiving more votes than any other candidate running in the election. The North Pole City Council certified the election results and declared Acevedo the winner of a three-year seat on the Council.

At a November 16, 1981 Council meeting, Acevedo stated his intention to remain both in the employ of the City and on the Council. The Council assumed that this was in violation of section 2.3 of the City of North Pole Home Rule Charter, unless the operation of that provision were waived by the Council. Section 2.3 provides:

> A person who holds or has held an elective City office shall not be eligible for appointment to an office or for employment for which a salary is paid by the City until one year has elapsed following the term for which he was elected or appointed. An exception may be made with the approval of four or more members of the Council.

The Council voted on a waiver for Acevedo, Acevedo excusing himself from voting. The vote was three for and three against. Thus, the measure did not pass. Acevedo

was terminated from his position as a police officer on November 23, 1981.

Acevedo filed a complaint in superior court on February 16, 1982. He was joined by co-plaintiffs Melissa Bidwell and Gene Cessna, persons who had cast their votes for Acevedo.

 On cross-motions for summary judgment as to liability, the superior court entered summary judgment in favor of the City and filed Findings of Fact and Conclusions of Law. The court awarded $100.00 in attorney's fees to the City. Acevedo appeals.[1]

## I. STATE PRE–EMPTION

 Acevedo first argues that section 2.3 is pre-empted by state law.[2] State pre-emption of municipal enactments occurs when a particular exercise of authority has been prohibited to municipalities. *City of Kodiak v. Jackson,* 584 P.2d 1130, 1132 (Alaska 1978). "The prohibition must be either by express terms or by implication such as where the statute and ordinance are so substantially irreconcilable that one cannot be given its substantive effect if the other is to be accorded the weight of law." *Id.* (quoting *Jefferson v. State,* 527 P.2d 37, 43 (Alaska 1974)). Acevedo does not argue pre-emption by implication. He contends

1. In accordance with Appellate Rule 204(c)(1), Acevedo filed a bond for costs on appeal consisting of an undertaking by Acevedo and Cliff Manning, as principal and surety respectively, to be bound for costs of up to $750.00 if Acevedo's appeal were dismissed, or the judgment affirmed, or the judgment modified with costs awarded to the City. The City objected to the form of the cost bond, primarily on the ground that it provided inadequate security. The superior court ruled that Manning's affidavit stating that he was worth more than $750.00 after exemptions and liabilities satisfied the qualification requirements of Civil Rule 80(b)(1), and that this provided adequate security for the cost bond. Thereafter the City requested a hearing to examine Manning's qualifications. After the hearing, in which only Manning testified, the court ruled that Manning was qualified to act as surety. The City has cross-appealed these rulings, arguing that the superior court erred in failing to require additional security for the cost bond.

The City makes two arguments. Its first argument, broadly stated, is that the superior

court erred in concluding that Manning was financially qualified to act as a surety. Second, it argues that in cases involving individual sureties, Appellate Rule 204(c) requires either a $750.00 cash deposit or a pledge of property worth that amount to secure costs on appeal.

We reject both of these points. Manning's testimony established that he was an Alaska resident worth more than $750.00 after exemptions and liabilities. Thus, the superior court was entitled to conclude that Manning was qualified to act as surety pursuant to Civil Rule 80(b)(1). Appellate Rule 204(c)(1) simply states that a bond for costs on appeal shall have "sufficient surety." It does not require a pledge of property or a cash deposit in all cases where an individual surety is used. We therefore find no merit in the City's cross-appeal.

2. Alaska Const. art. X, § 11 provides:
 *Home Rule Powers.* A home rule borough or city may exercise all legislative powers not prohibited by law or by charter.

that AS 29.13.100 expressly prohibits municipal enactments such as section 2.3.

 AS 29.13.100 provides:

*Limitation of home rule powers.* Only the following provisions of this title apply to home rule municipalities as prohibitions on acting otherwise than as provided. They supersede existing and prohibit future home rule enactments which provide otherwise:

. . . .

(33) AS 29.23.555 (conflict of interest);

. . . .

AS 29.23.555 states in part:

*Conflict of interests.* Each home rule and general law municipality shall adopt a conflict-of-interests ordinance which, other provisions of this chapter notwithstanding, includes provision that an officer or employee shall disqualify himself from participating in any official action in which he has a substantial financial interest.

There is no express pre-emption based on these provisions in this case. The City has enacted a charter section prohibiting members of the City Council from voting on matters in which they have a pecuniary interest.[3] Thus the mandate of AS 29.23.-555 has been obeyed. Section 2.3 goes beyond what is required by AS 29.23.555, but the statute does not prohibit the enactment of ordinances which go beyond its requirements. To the contrary, it states that a conflict-of-interest ordinance must be enacted which *includes* a provision governing pecuniary conflicts. The clear implication is that other conflict-of-interest provisions may also be enacted, so long as pecuniary conflicts are addressed in the manner provided by AS 29.23.555. To rule otherwise would render AS 29.23.540(c) meaningless. It provides that "[n]o state employee or

3. Section 3.6(1) of the City of North Pole Home Rule Charter provides that "[n]o member of the Council may vote on any question upon which he has a direct or indirect pecuniary interest."

4. Acevedo also argues that section 2.3 should be construed in favor of his position based on the rule of construction that municipal ordinances which are ambiguous will be construed so as to favor individual rights. *See Duncan v.*

school district employee may be denied the right to serve as an elected municipal official because of his employment by the state or a school district *unless specifically prohibited by charter or ordinance of a municipality, adopted at a special or general election."* (Emphasis added).

## II. INTERPRETING THE CHARTER PROVISION

 Acevedo next argues that section 2.3 should not be interpreted to prohibit his continued employment as a police officer, based on the rule of construction that a municipal enactment should be liberally interpreted so as to achieve its object.[4] *See* 1A C. Sands, Statutes and Statutory Construction § 30.06 (3d rev. ed. 1972). He states:

The obvious and only common sense purpose of section 2.3 is to prevent a person from obtaining a municipal job if he has been in a position to use his power as a City official to influence another City official or employee to hire him, to hire himself, to create a new . . . job for himself, or to increase the salary for a job he plans to take.

Because preventing the use of influence to attain a job is the section's only purpose, Acevedo concludes, section 2.3 must be interpreted to preclude the initiation, but not the continuation, of employment by the City of its elected officials.

The City, on the other hand, contends that the purpose of section 2.3 is not so limited. It argues that the section's purpose is to prevent this use of influence *and* to prevent elected City officials from simultaneously holding positions as City employees.[5]

*City of Fairbanks,* 567 P.2d 311, 313 (Alaska 1977). However, this argument presumes an ambiguity in section 2.3 which we do not believe exists.

5. Neither party refers our attention to any legislative history behind the enactment of section 2.3.

"The simultaneous holding of more than one public office has been a traditional subject of public concern." *Cummings v. Godin,* 377 A.2d 1071, 1074 (R.I.1977) (citing *Osetek v. City of Chicopee,* 370 Mass. 110, 345 N.E.2d 897 (1976)). This concern was reflected in the common law rule against the holding of incompatible offices, which rule was later extended to include public employment. *See Knuckles v. Board of Education of Bell County,* 272 Ky. 431, 114 S.W.2d 511 (1938) and cases cited therein; *Haskins v. State ex rel. Harrington,* 516 P.2d 1171, 1174–78 (Wyo.1973). Many jurisdictions have enacted provisions in accordance with this rule, some prohibiting the holding of more than one office or employment whether or not the positions were incompatible under the common law. *Doyle v. City of Dearborn,* 370 Mich. 236, 121 N.W.2d 473, 475 (1963); *see* 3 E. McQuillan, Municipal Corporations § 12.66 (3d rev. ed. 1982). The purposes attributed to such provisions include: (1) preventing multiple position-holding, so that offices and positions of public trust would not accumulate in a single person; (2) preventing individuals from deriving, directly or indirectly, any pecuniary benefit by virtue of their dual position-holding; (3) avoiding the inherent conflict which occurs when an employee's elected position has revisory power over the employee's superior in another position; and (4) generally, to insure that public officeholders and public employees discharge their duties with undivided loyalty. 3 E. McQuillan, Municipal Corporations § 12.67 (3d rev. ed. 1982); *Cummings v. Godin,* 377 A.2d at 1075; *see also Warwick v. State ex rel. Chance,* 548 P.2d 384 (Alaska 1976). *Begich v. Jefferson,* 441 P.2d 27 (Alaska 1968).

Acevedo's interpretation ignores this traditional concern regarding the simultaneous holding of more than one public position, and accepting it would not completely serve the aforementioned objects. Since it appears to us that section 2.3 is unambiguously directed toward serving these interests, we reject Acevedo's argument that section 2.3 does not prohibit his continued employment as a police officer.

## III. EQUAL PROTECTION AND THE RIGHT OF FRANCHISE

Acevedo's third argument is that section 2.3 violates the Alaska Constitution. He argues that section 2.3 singles out City employees for a deprivation of fundamental political rights by requiring them to resign their employment prior to assuming a seat on the City Council, in violation of the Alaska equal protection clause. Alaska Const. art. I, § 1. He also argues that section 2.3, by placing a burden on City employees who seek election to the City Council, unduly restricts the rights of franchise of the citizens of North Pole, which rights are guaranteed by Alaska Const. art. V, § 1.[6]

The City, on the other hand, argues that section 2.3 is a valid condition of municipal employment, and that the rights asserted by Acevedo are subject to reasonable restriction.

To select the appropriate standard of review, we must consider the importance of the rights asserted by Acevedo and the extent to which they are burdened. *See Clements v. Fashing,* 457 U.S. 957, 964, 102 S.Ct. 2836, 2844, 73 L.Ed.2d 508, 516 (1982) (plurality opinion); *Bullock v. Carter,* 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92, 99–100 (1972); *State v. Ostrosky,* 667 P.2d 1184, 1192 (Alaska, 1983); *State v. Erickson,* 574 P.2d 1, 11–12 (Alaska 1978); *Vogler v. Miller,* 651 P.2d 1, 3 (Alaska 1982).

Accordingly, we will consider Acevedo's constitutional arguments only insofar as they pertain to the restrictions posed by section 2.3 itself, and not as they pertain to the Council's ability to waive its operation. *See Lewis v. State,* 469 P.2d 689, 691–92 n. 2 (Alaska 1970); *State v. O'Neill Investigations, Inc.,* 609 P.2d 520, 528 (Alaska 1980).

---

**6.** Acevedo also makes a conclusory one paragraph argument that the manner in which the City Council has exercised its ability to waive the operation of section 2.3 in the past has been so arbitrary and irrational as to exacerbate the section's violation of equal protection and reach substantive due process proportions. Remarkably, he does so without a single citation to authority or to the record.

Candidacy has been characterized by this court as one of the ultimate forms of political expression: "Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms." *Vogler v. Miller*, 651 P.2d at 3 (quoting *Williams v. Rhodes*, 393 U.S. 23, 32, 89 S.Ct. 5, 11, 21 L.Ed.2d 24, 32 (1968)). And concerning the right to vote, we have stated that "[n]o right is more precious in a free country...." *Id.* It is thus abundantly clear that Acevedo has asserted rights of paramount importance under the Alaska Constitution.

However, the extent to which these rights are burdened by section 2.3 is less clear. The provision leaves many of the City's employees' political rights relatively unaffected. It does not hinder their rights to take active roles in political campaigns, other than as candidates, or to make public statements concerning political issues. *Compare Civil Service Commission v. Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Nor does section 2.3 require City employees to "resign-to-run;" that is, an employee is not required to balance his or her secure job working for the City against a complete leap into the dark as a candidate for the City Council. *See Morial v. Judiciary Commission of the State of Louisiana*, 565 F.2d 295, 301 (5th Cir.1977), *cert. denied*, 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978). Further, unlike the provisions reviewed in *Vogler v. Miller*, 651 P.2d 1 (Alaska 1982), and *Gilbert v. State*, 526 P.2d 1131 (Alaska 1974), section 2.3 does not stand as a flat prohibition against an employee's candidacy due to the absence of factors more or less beyond the employee's control. Rather, employees are free to place their names on the ballot, campaign, and even be elected to the City Council. At

that point, the choice between the Council seat and City employment is entirely up to the employee.

Likewise, the impact of section 2.3 on the rights of North Pole voters is not as substantial as restrictions which exclude candidates of an identifiable viewpoint, e.g., the poor, *Lubin v. Panish*, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974), or minority parties and candidates, *Vogler v. Miller*, 651 P.2d 1 (Alaska 1982); *Vogler v. Miller*, 660 P.2d 1192 (Alaska 1983). *See Clements v. Fashing*, 457 U.S. 957, 965, 102 S.Ct. 2836, 2844, 73 L.Ed.2d 508, 517 (1982) (plurality opinion); *Morial v. Judiciary Commission*, 565 F.2d at 301–02.

■ On the other hand, because section 2.3 puts City of North Pole employees to the onerous choice between their source of livelihood and their political ambitions, it certainly deters their candidacies, and this deterrence also impinges on the franchise rights of North Pole voters, whose selection of candidates may therefore be substantially restricted. For this reason, and due to the importance of these political rights, we conclude that we should select a strict standard of review. Thus, we require that section 2.3 serve compelling governmental interests and that the means-ends relationship between section 2.3 and those interests be correspondingly close.[7]

■ We previously noted that dual position-holding prohibitions are designed to serve the following governmental interests: (1) preventing public servants from accumulating many positions, resulting in a "pyramid of power"; (2) avoiding direct or indirect pecuniary conflicts; (3) preventing employees from asserting control over their supervisors through their elected positions; and (4) assuring that public servants exercise their duties with undivided loyalty. *See* section II *supra*. We view these gov-

---

**7.** The following courts have likewise applied strict standards of review to candidacy restrictions on public employees: *Kinnear v. City and County of San Francisco*, 61 Cal.2d 341, 38 Cal.Rptr. 631, 392 P.2d 391, 392 (1964); *Galer v. Bd. of Regents of the Univ. Sys.*, 239 Ga. 268, 236 S.E.2d 617, 619 (1977); *Johnson v. State, Civil Serv. Dep't*, 280 Minn. 61, 157 N.W.2d 747, 751 (Minn.1968); *Minielly v. State*, 242 Or. 490, 411 P.2d 69, 76 (1966) (en banc); *Commonwealth ex rel. Specter v. Moak*, 452 Pa. 482, 307 A.2d 884, 888–89 (1973); *Cummings v. Godin*, 377 A.2d 1071, 1076 (R.I.1977); *Haskins v. State ex rel. Harrington*, 516 P.2d 1171, 1173 (Wyo.1973).

ernmental interests as sufficiently important to justify the restrictions imposed by section 2.3. Further, we conclude that the means-ends relationship between section 2.3 and these interests is sufficiently close to avoid invalidation. Acevedo's point that the avoidance of pecuniary conflicts is already served by section 3.6(1) of the City of North Pole Home Rule Charter is well taken. Thus, section 2.3 is unnecessary to that interest. However, the remaining interests are well served by the provision at issue, and we are convinced that a less restrictive alternative would not serve them well enough. While Acevedo could merely have been prohibited from taking part in decisions which affected him as a City employee, such a prohibition would have denied the Council input from one of its seven members in all decisions concerning police matters and all decisions concerning employee relations. Moreover, considerable possibilities of political bargaining would nonetheless remain. *See Magill v. Lynch,* 560 F.2d 22, 29 (1st Cir.1977), *cert. denied,* 434 U.S. 1063, 98 S.Ct. 1236, 55 L.Ed.2d 763 (1978).

■ Our decision finds support in the common law tradition prohibiting dual posi-

tion-holding, *see* section II *supra,* and in a large body of case law subjecting provisions such as section 2.3 to constitutional scrutiny.[8] Our decision also finds support in other provisions of the Alaska Constitution. Alaska Const. art. II, § 5 serves the same purposes as section 2.3. *See Warwick v. State ex rel. Chance,* 548 P.2d 384, 387–88 (Alaska 1976); *Begich v. Jefferson,* 441 P.2d 27, 31 (Alaska 1968). Thus, the framers of our constitution indicated their view that, with respect to the state legislature, dual position-holding may be prohibited without violating equal protection or unduly impinging upon the right of franchise. The same may be said of Alaska Const. art. III, § 6 with respect to the executive branch, and of Alaska Const. art. IV, §§ 8 and 14 with respect to the judiciary.[9] We hold that a home rule city may likewise prohibit dual position-holding consistent with equal protection and the right of franchise when, as here, the prohibition is narrowly drawn to serve compelling governmental interests.[10]

## IV. PERSONNEL CODE

■ Acevedo argues that his termination as a police officer violated the City of

---

**8.** Of the cases cited in n. 7 *supra,* only *Kinnear v. City and County of San Francisco; Minielly v. State;* and *Cummings v. Godin* struck down candidacy restrictions. Further, the *Cummings* court suggested that it would endorse a provision similar to section 2.3, 377 A.2d at 1079 and n. 9, and the *Minielly* court has done so. *See Ivancie v. Thornton,* 250 Or. 550, 443 P.2d 612 (1968), *cert. denied,* 393 U.S. 1018, 89 S.Ct. 623, 21 L.Ed.2d 563 (1969). *See also Clements v. Fashing,* 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) (plurality opinion); *Civil Service Commission v. Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *Morial.v. Judiciary Comm'n,* 565 F.2d 295 (5th Cir.1977), *cert. denied,* 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978); *Magill v. Lynch,* 560 F.2d 22 (1st Cir.1977), *cert. denied,* 434 U.S. 1063, 98 S.Ct. 1236, 55 L.Ed.2d 763 (1978); *Lay v. City of Kingsport, Tenn.,* 454 F.2d 345 (6th Cir.1972), *cert. denied,* 409 U.S. 846, 93 S.Ct. 50, 34 L.Ed.2d 87 (1972); *Mortillaro v. State of Louisiana,* 356 F.Supp. 521 (E.D.La.1972); *Wilson v. Moore,* 346 F.Supp. 635 (N.D.W.Va.1972); *Wisconsin State Emp. Ass'n v. Wisconsin Nat. Resources Bd.,* 298 F.Supp. 339 (W.D.Wis.1969); *Bellon v. Deshotel,* 370 So.2d 221 (La.App.

1979); *Boston Police Patrolmen's Ass'n, Inc. v. City of Boston,* 367 Mass. 368, 326 N.E.2d 314 (1975); *State ex rel. Gonzales v. Manzagol,* 87 N.M. 230, 531 P.2d 1203 (1975).

**9.** Alaska Const. art. III, § 6 provides:

The governor shall not hold any other office or position of profit under the United States, the State, or its political subdivisions.

Alaska Const. art. IV, § 8 provides in part:

No member of the judicial council, except the chief justice, may hold any other office or position of profit under the United States or the State.

Alaska Const. art. IV, § 14 provides in part:

Supreme court justices and superior court judges while holding office may not practice law, hold office in a political party, or hold any other office or position of profit under the United States, the State, or its political subdivisions.

**10.** The fact that section 2.3 provides for an exception "with the approval of four or more members of the council" does not affect our analysis because the constitutional question presented would be the same with or without the exception.

nt

North Pole Personnel Code. However, section 2.3 is a provision of the City of North Pole Home Rule Charter. As such it is a part of the organic law of the municipality, and the Personnel Code is therefore subject to its terms.[11] Thus, the Personnel Code is irrelevant to the resolution of this case.

### V. ATTORNEY'S FEES

█ Finally, Acevedo argues that the superior court erred in awarding attorney's fees to the City. He claims that he is a public interest litigant. However, this argument is foreclosed by the "fourth criterion" in determining public interest status set forth in *Kenai Lumber Co. v. LeResche,* 646 P.2d 215, 223 (Alaska 1982); that is, "whether the litigant claiming public interest status would have had sufficient economic incentive to bring the lawsuit even if it involved only narrow issues lacking general importance." *Id.* Since Acevedo's job as a police officer was at stake, the superior court could reasonably have concluded that he had sufficient economic reasons to challenge section 2.3 regardless of the grounds for the challenge.[12] We therefore hold that the award of attorney's fees to the City was not an abuse of discretion.

AFFIRMED.

### RABINOWITZ, Justice, dissenting.

The court declines to address the question of whether section 2.3 is constitutionally infirm because it excepts dual office holding which occurs "with the approval of four or more members of the council," observing that the presence of this waiver clause has no effect on the constitutional inquiry. In my view this provision allowing exceptions renders section 2.3 invalid under article I,

§ 1 of the Alaska Constitution. Thus, I dissent from the majority's holding that section 2.3, as it stands, is "narrowly drawn to serve compelling governmental interests" and from the further conclusion that the high standards imposed pursuant to a strict scrutiny analysis have been met.

By its own terms, section 2.3 does not purport to serve a "compelling state interest." The "waiver clause" renders untenable any contention that it promotes an important objective. Whether section 2.3 addresses per se evils, such as "pyramids of power," or is intended to operate preventively, forestalling the development of potential conflict of interest problems, it makes no sense to permit four city council members to exercise unguided discretion in determining when the interests served by section 2.3 are or are not met. Neither interest should be subsumed to such a waiver clause. Thus, on its face, section 2.3 fails to satisfy the "compelling state interest" requirement.

Furthermore, section 2.3 is not framed to produce the close means/ends relationship which must exist if it is to withstand strict scrutiny analysis. This, too, is a result of the fact that four or more members of the city council are permitted to exercise unfettered discretion in granting or denying "waivers." There is no assurance that the council's discretion will be applied only when dual office holding would result in an individual accumulating numerous positions or would create conflict of interest situations.[1] Thus, I would hold section 2.3 invalid on the ground that it is not designed to promote the realization of its purported objectives with the consistency necessary to satisfy a strict scrutiny analysis.[2]

11. AS 29.13.070(a) provides in part:
 If a majority of those voting on the question favor the proposed charter, it becomes the organic law of the municipality.

12. This point distinguishes the present case from *Gilbert v. State,* 526 P.2d 1131 (Alaska 1974), which Acevedo relies on.

1. The majority declines to consider Acevedo's argument regarding the arbitrariness and irrationality of section 2.3 because he failed to cite

authority or portions of the record in support of his claim. This position is untenable. Since the irrationality of section 2.3 is apparent on the face of the provision, evidence regarding its actual application is unnecessary to support Acevedo's claim.

2. The court's assertion that its decision finds support in a large body of case law is questionable. The "waiver clause," which I conclude is fatal to section 2.3, was not present in any of the provisions examined by those courts, which

generally were blanket prohibitions on dual office holding or partisan activity while in public employ. None of the prohibitory clauses permitted exceptions to be made by majority vote of the office-holder's peers.

Although it may be arguable that the last sentence of section 2.3 (the waiver provision) is severable from the remainder of the section, the parties did not raise this argument. Therefore, I do not reach the question of whether section 2.3 would be constitutional independently of the waiver clause.