## STATE EX REL. AUGUST J. DUREN v. DR. W. L. PATTERSON AND OTHERS.[1]

June 22, 1951.

No. 35,569.

[1]Reported in 48 N. W. (2d) 574.

433

Robins, Davis & Lyons, for appellant.

J. A. A. Burnquist, Attorney General, and Lowell J. Grady, Assistant Attorney General, for respondents.

MAGNEY, JUSTICE.

On July 15, 1935, August J. Duren, relator in the court below, commenced working for the state of Minnesota as plant operation superintendent at the Fergus Falls State Hospital. In September 1950, his position under the classified service of the state was that of chief power engineer. His salary was $370 a month, with $75 a month taken out for subsistence and housing, which salary was paid to him up to and including September 29, 1950. On September 28, 1950, Duren caused to be delivered to respondent Dr. W. L. Patterson, as superintendent of the hospital and relator's appointing officer, his written resignation as chief power engineer at the hospital, which resignation, dated September 28, 1950, reads in full as follows:

"I hereby submit my resignation as Chief Power Engineer at the Fergus Falls State Hospital, Fergus Falls, Minn., to take effect the 6th. day of November, 1950.

"I have business matters that require my attention and find it necessary to resign."

Copies of the resignation were sent to respondent Carl J. Jackson, state director of public institutions, William Solomonson, chief power engineer for the state, and the state civil service department. Prior to the submission of his resignation, Duren had secured sufficient signatures of voters on a required petition to qualify him to

file as an independent candidate for the office of congressman for the ninth congressional district of Minnesota. On September 27, 1950, Duren made a political speech over the local radio station in behalf of his candidacy as an independent candidate for congress. On September 29, 1950, he filed with the county auditor of Otter Tail county, the county of his residence, a notarized certificate of nomination by petition for the office of congressman for the ninth congressional district as an independent candidate at the general election to be held on November 7, 1950. He paid the required filing fee of $20. From September 29, 1950, to and including November 6, 1950, Duren actively engaged in a campaign in support of his candidacy throughout the congressional district. The extent of his activity in this respect may be judged by the amount ($213.85) he spent for gasoline and oil, as shown by the verified expense account filed by him. On or about September 29, 1950, Dr. Patterson, as superintendent of the hospital and acting for and in behalf of the division of public institutions, caused to be filed with the state civil service department documents notifying that department of Duren's resignation, and within a few days thereafter requisitioned the department to certify to him a list of eligible candidates to fill the vacancy created by the resignation of Duren. On or about October 19, 1950, Dr. Patterson, pursuant to the authority vested in him, employed one Robert Shorter to fill the vacancy. On November 1, 1950, Shorter actively assumed the duties of, and ever since said date has been, the chief power engineer at the hospital. In the middle of October, Dr. Patterson asked Duren to give him some idea when he was going to vacate the house. Duren answered: "I won't be moving until after November 6th."

On September 28, 1950, Duren had to his credit annual or vacation leave equal to a total of 24 working days, which he had accumulated while in his employ by the state prior to September 29, 1950. The annual or vacation leave extended from September 29, 1950, to Friday, November 3, 1950. On or about November 6, 1950, as authorized by M. S. A. 351.12, the state issued Duren a state auditor's warrant in the aggregate amount of $407, and in the net amount

of $256.15, after making deductions for amounts required by law, representing payment in full of the accumulated annual leave due him. On or about November 9, 1950, Duren accepted said warrant, endorsed the same, and received and kept the proceeds thereof.

On November 6, 1950, by the following communication, Duren attempted to withdraw his resignation:

"November 6, 1950

"Dr. W. L. Patterson, Supt.
Fergus Falls State Hospital
Fergus Falls, Minn.

"Dear Dr. Patterson:

"I hereby withdraw my resignation submitted to you on September 28, 1950 and to become effective as of November 6th, 1950 'inclusive'.

"I desire to be reinstated.

"Respectfully yours,
"AUGUST J. DUREN

"CC Wm. Solomonson
CC Carl Jackson
CC State Civil Service Dept."

The request of Duren to be reinstated was denied by Dr. Patterson on November 10, 1950. At the time of trial, Duren still continued to reside at the residence on the hospital grounds, which housing accommodation had been provided for him as a part of his employment. He received no pay for work after September 29, 1950. During the time he was campaigning, one Oscar Anderson, an assistant, was performing his work, and since November 1, 1950, Shorter, as stated, has performed those duties.

On the above facts, the court quashed the alternative writ of mandamus theretofore issued, directed to Dr. W. L. Patterson, superintendent of the Fergus Falls State Hospital; Carl J. Jackson, state director of the division of public institutions; Val Bjornson, state treasurer; Stafford King, state auditor; the state civil service board; Earl L. Berg, state commissioner of administration;

and Robert D. Stover, state director of civil service, requiring them to pay Duren the full amount of his salary and wages from September 29, 1950, or show cause why they had not done so. From an order denying his motion for a new trial, Duren appealed.

The state civil service act was established by L. 1939, c. 441, and is coded as M. S. A. 43.01 to 43.36. The last sentence of § 43.28 provides:

"Any officer or employee in the state classified service shall resign from the service upon filing as a candidate for public office."

This provision is incorporated in the state civil service rules as Rule 15.4.

There is no room for speculation as to the legislative purpose or intent in adopting the above enactment. It can have only one purpose, and that is to obviate the evils which necessarily follow when officers or employes in the classified service of the state are permitted to engage in political activity to the extent of running for office. The constitutionality of the statute is not questioned. It could not very well be in view of United Public Workers v. Mitchell, 330 U. S. 75, 67 S. Ct. 556, 91 L. ed. 754.

It is evident that Duren knew of the provisions of the statute and the civil service rule before he submitted his resignation, because the resignation complied with the requirements thereof, except that by the wording of the resignation it was not to take effect when he filed for office, but on November 6, 1950, the day before the general election. Undoubtedly he had in mind that if the prospects for election seemed dim on November 6 he could withdraw his resignation, as he actually attempted to do, and thus retain his position in the classified service of the state. The statute in question is not so worded as to permit a resignation under those circumstances to take effect in the future. Nor could its intention have been such. It would be odd if the legislature intended to permit an officer or employe in the classified service of the state to file for public office, and then not have the resignation which he submits under the statute take effect until the campaign is over. Under

such a scheme, if the officer or employe was elected, his resignation would be effective; if defeated, there could be an attempted withdrawal of his resignation. The statute is plain and specific. It provides that any officer or employe under civil service shall resign upon filing as a candidate for public office. Duren did resign and he did file for public office. Although in his submitted resignation he gave as his reason that he had business matters which required his attention, it is obvious from his activities immediately before and immediately after the submission of his resignation that he resigned in contemplation of becoming a candidate in the approaching general election.

Duren insists that he was at liberty to withdraw his resignation, since no one in authority accepted it. The statute required the resignation of Duren when he filed for office. No one of his superiors had authority to refuse its acceptance. He submitted his resignation. He immediately filed for office. By his own actions, Duren separated himself from the classified service of the state.

Duren claims that the statute is not self-executing; that under the provisions of the civil service statute he is entitled to have charges filed against him and a hearing thereon. We are not dealing with a situation where a civil service officer or employe simply files for public office and does not resign. Here, the filing was accompanied by a resignation, which, under the statute, in our opinion, separated Duren from his job. The question here is not whether by merely filing for public office the officer or employe was automatically separated from his position in the classified service.

Many other questions are raised and discussed in the briefs. Since our view is that the application of the statute to Duren's actions separated him from the classified service of the state as of the date he filed for congress, it is unnecessary to discuss the other questions raised.

Order affirmed.